# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MARIA FARMER,

        Plaintiff,                             CASE NO:

v.

DARREN K. INDYKE and RICHARD D. KAHN,
in their capacities as the executors of the
ESTATE OF JEFFREY EDWARD EPSTEIN,

        Defendants.

_____

## **<u>COMPLAINT</u>**

BOIES SCHILLER FLEXNER LLP

Plaintiff Maria Farmer, by her attorneys Boies Schiller Flexner LLP, for her Complaint against Defendants, Darren K. Indyke and Richard D. Kahn in their capacities as the executors of the Estate of Jeffrey Edward Epstein ("Epstein"), avers upon personal knowledge as to her own acts and status and upon information and belief and to all other matters as follows:

### NATURE OF THE ACTION

1.      This suit arises out of Jeffery Epstein's sexual assault of Plaintiff.

2.      Maria Farmer was sexually trafficked by Epstein and a co-conspirator as part of his organized ring of procuring young females for sex.  As an aspiring artist, Maria believed that Epstein's connections to the art world would help further her career when he offered her a position to procure art for him.  Maria began working for Epstein in his Manhattan mansion, performing a variety of tasks including procuring art and manning the guest check in at the front door of the home.  During the course of her employment for Epstein, Epstein and Ghislaine Maxwell violently sexually assaulted Maria while she was working on an art project at Epstein's guest house on Les Wexner's Ohio estate, and threatened to ruin her career and her life if she told anyone about the assault.

3.      Epstein's trafficking scheme involved recruiting young females by making false promises and using his wealth, power and threats to intimidate the females into submission to his demands.  This same pattern was repeated numerous times with numerous young women.

4.      As United States District Judge Kenneth Marra found, "From between about 1999 and 2007, Jeffrey Epstein sexually abused more than 30 minor girls . . . at his mansion in Palm Beach Florida, and elsewhere in the United States and overseas. . . . In addition to his own sexual abuse of the victims, Epstein directed other persons to abuse the girls sexually.  Epstein used paid employees to find and bring minor girls to him.  Epstein worked in concert with others to obtain

minors not only for his own sexual gratification, but also for the sexual gratification of others."
*Doe 1 v. United States*, 359 F. Supp. 3d 1201, 1204 (S.D. Fla. 2019) (internal citations omitted).

5.     Epstein organized this sex trafficking network to obtain hundreds of young females for himself for sex, and also lent these females out to other powerful and wealthy individuals to be sexually abused.

6.     Epstein conspired with others and hired staff to maintain and keep secret this network of sexual abuse for years, which sprawled throughout Epstein's residences in New York, Florida, New Mexico, the United States Virgin Islands, and Paris.  Epstein's preference was to have three different girls a day for his sexual pleasure.

7.     Despite his significant criminal activity, in 2008 Epstein received a shockingly minimal charge pleading guilty to a single Florida state law charge of procuring a minor for prostitution and a non-prosecution agreement (a "NPA") with the U.S. Attorney for the Southern District of Florida.  Unknown to the public and the victims at the time, Epstein's lawyers were pressuring the Government to commit to the NPA without informing the victims.  Epstein's multiple victims were kept in the dark and told to be "patient" while Epstein's lawyers worked to protect him and other potential co-conspirators from prosecution.  Epstein served one year in jail, but was afforded the privilege of being able to leave the jail to go to work for twelve hours per day, six days per week.

8.     The NPA allowed Epstein to escape proportionate punishment for his actions and to continue operating his sex trafficking enterprise with liberty.

9.     A few years later, Epstein flippantly referred to his sexual abuse of multiple minors, and the slap on the wrist he had received for it, in a 2011 interview with the New York Post: "Billionaire pervert Jeffrey Epstein is back in New York City – and making wisecracks about his

just-ended jail stint for having sex with an underage girl. 'I am not a sexual predator, I'm an

offender,' the financier told The Post yesterday. 'It's the difference between a murderer and a

person who steals a bagel,' said Epstein."  Amber Sutherland, *Billionaire Jeffrey Epstein:  I'm a*

*Sex Offender Not a Predator*, N.Y. Post (Feb. 25, 2011),

https://nypost.com/2011/02/25/billionaire-jeffrey-epstein-im-a-sex-offender-not-a-predator/.

10.     In August 2018, just one year before his death, Epstein told a New York Times reporter

"that criminalizing sex with teenage girls was a cultural aberration and that at times in history it

was perfectly acceptable."  James B. Stewart, *The Day Jeffrey Epstein Told Me He Had Dirt on*

*Powerful People*, N.Y. Times (Aug. 12, 2019),

https://www.nytimes.com/2019/08/12/business/jeffrey-epstein-interview.html.

11.     When Plaintiff was 26 years old, Epstein added her to his long list of victims by

committing sexual assault and battery against her.  As such, Epstein is responsible for battery

and intentional infliction of emotional distress pursuant to New York common law.  The damage

to Plaintiff has been severe and lasting.

12.     This action has been timely filed pursuant to N.Y. C.P.L.R. § 215(8)(a), which provides

that a plaintiff shall have at least one year from the termination of a criminal action against the

same defendant to commence an action with respect to the event or occurrence from which the

criminal action arose.  A criminal action against Epstein with respect to the same sex trafficking

enterprise from which Plaintiff's claims arise was terminated on August 29, 2019.

13.     Any statute of limitations applicable to Plaintiff's claims, if any, is tolled due to the

continuous and active deception, duress, threats of retaliation, and other forms of misconduct that

Epstein and his co-conspirators used to silence his many victims, including Plaintiff.  Epstein's

actions deprived Plaintiff of the opportunity to commence this lawsuit before his death.  Until his

death, Plaintiff feared that Epstein and his co-conspirators would harm her or her family, or ruin her life, if she came forward.

14.     Defendants are equitably estopped from asserting a statute of limitations defense. Allowing Defendants to do so would be unjust.  Epstein and his employees intimidated each of his victims into silence by threatening their lives and their livelihoods.  They therefore prevented Plaintiff from commencing this lawsuit before his death.  By using threats, along with his wealth and power, Epstein was able to escape punishment for his intolerable and brutal crimes against countless young women and underage girls for the duration of his life.

### PARTIES

15.     Plaintiff Maria Farmer is a citizen and resident of Arkansas.

16.     Defendant Darren K. Indyke is sued in his capacity as an appointed executor of the Estate of Jeffrey E. Epstein.

17.     Defendant Richard D. Kahn is sued in his capacity as an appointed executor of the Estate of Jeffrey E. Epstein.

### JURISDICTION AND VENUE

18.     Jeffrey Epstein was a citizen of the United States domiciled in the U.S. Virgin Islands at the time of his death.  Jeffrey Epstein maintained a residence in the Southern District of New York.  As the legal representatives of the Estate of Jeffrey E. Epstein, Darren K. Indyke and Richard D. Kahn are deemed citizens of the U.S. Virgin Islands.

19.     The amount in controversy in this action exceeds the sum or value of $75,000.00 excluding interests and costs and is between citizens of different states. Accordingly, jurisdiction is proper under 28 U.S.C. § 1332.

20.     Venue is proper in this Court as Epstein's sexual abuse of Plaintiff began in New York, New York, where he recruited her to be a part of his organized sex trafficking ring.

21.     Many of the events giving rise to these causes of action occurred in the Southern District of New York, where a substantial amount of Epstein's property is located.  Thus, venue in this district is proper.  28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

**A.**     **Epstein's Sex Trafficking Enterprise**

22.      Jeffrey Epstein was widely renowned as a billionaire who used his vast connections to powerful individuals, and seemingly unlimited wealth and resources, to create a web of transcontinental sex trafficking that served himself, his co-conspirators, and some of the most powerful people in the world.

23.     Epstein owned multiple residences and frequently travelled between them, including at 9 East 71st Street, New York, New York 10021, and at 49 Zorro Ranch Road, Stanley, New Mexico 87056, where the illegal sexual crimes against Plaintiff occurred.  Epstein conservatively valued his New York townhome at $55,931,000.00.  Epstein conservatively valued his New Mexico ranch at $17,246,208.00.  In addition, Epstein owned residences in the Virgin Islands, Florida, France, and even on his own island, Great St. James Island, where his transcontinental sex trafficking of hundreds of young girls servicing him, his co-conspirators, and wealthy and powerful individuals around the world occurred.

24.     At all times material to this cause of action, Jeffrey Epstein utilized his seemingly unlimited power, wealth, and resources, as well as his deep connections to powerful and politically connected individuals to intimidate and manipulate his victims of sexual abuse.

25.     Epstein and his co-conspirators had perfected a scheme for manipulation and abuse of young females.  As part of the scheme, a female "recruiter" would approach a young female and strike up a conversation in an effort to quickly learn about the young female's background and any vulnerabilities they could expose.  The recruiter would then manipulate the young female into coming back to one of Epstein's residences by offering the young female something she needed.  At times the recruiter's lure would be a modeling opportunity, money for education, help for the young female's family, and a whole host of other related offers depending on their target's situation.  Once in the residence, the recruiter and Epstein would work in concert to impress and intimidate the young female with displays of vast wealth, including having employees that were butlers and maids formally dressed around the house.  They would also strategically place photographs of very powerful political and social figures amongst photographs and art displaying nude females in an effort to normalize the sexual abuse.  They would also normalize the sexual abuse by placing a massage table and spa related products around the massage area in an effort to legitimize the area where the abuse was set to occur. Once abused, Epstein and his co-conspirators continued to manipulate the victims, using their financial power, promises, and threats to ensure that the victim returned as directed and remained compliant with their demands.

**B.**     **The Arrest, Prosecution, and Death of Epstein**

26.     The sexual trafficking ring described herein started at least as early as 1995 and continued up until at least July 2, 2019, when the U.S. Attorney's Office for the Southern District of New York ("SDNY") charged Epstein with sex trafficking conspiracy and sex trafficking in violation of 18 U.S.C. § 1591. He was arrested on July 8, 2019, pursuant to the SDNY's Sealed Two Count Indictment, which is attached as Exhibit A.

7

27.     The Indictment described Epstein's conduct and his abuse and trafficking of females in the same trafficking operation he used to abuse and traffic Plaintiff.

28.     Epstein's last will and testament (the "Will") was executed on August 8, 2019, at the Metropolitan Correctional Center. The witnesses were Mariel Colón Miró and Gulnora Tali.  The Will included affidavits from Darren K. Indyke and Richard D. Kahn, in which they swear an "Oath of Willingness to Serve as Executor and Appointment of Local Counsel."

29.     Epstein was found dead in his cell at the Metropolitan Correctional Center on August 10, 2019.

30.     Epstein's last will and testament was filed on August 15, 2019, in the Probate Division of the Superior Court of the Virgin Islands.

31.     Darren K. Indyke and Richard D. Kahn filed a Certificate of Trust in the Superior Court of the Virgin Islands for Epstein's 1953 Trust on August 26, 2019.  *See* Certificate of Trust, *In the Matter of the Estate of Jeffrey E. Epstein*, Probate No. ST-19-PB-80 (Super. Ct. V.I. Aug. 26, 2019).

32.     Epstein's will was entered into probate on September 6, 2019, and the Superior Court of the Virgin Islands accordingly authorized Darren K. Indyke and Richard D. Kahn to administer Epstein's estate.  *See* Order for Probate, *In the Matter of the Estate of Jeffrey E. Epstein*, Probate No. ST-19-PB-80 (Super. Ct. V.I. Sept. 6, 2019); Letters Testamentary, *In the Matter of the Estate of Jeffrey E. Epstein*, Probate No. ST-19-PB-80 (Super. Ct. V.I. Sept. 6, 2019).

33.     The Will's first article directs Epstein's executors "to pay from my estate all expenses of my last illness, my funeral and burial expenses, the administration expenses of my estate and all of my debts duly proven and allowed against my estate."  The Will further directs that "after the

payments and distributions provided in Article FIRST," Epstein "give[s] all of my property, real and personal, wherever situated . . . to the then acting Trustees of The 1953 Trust."

34.     Following Epstein's death, SDNY submitted a proposed nolle prosequi order in the criminal matter against him because it was required by law to do so after Epstein was deceased. On August 29, 2019, U.S. District Judge Richard Berman formally dismissed SDNY's indictment against Epstein, terminating the criminal action against him.  Plaintiff's claims are therefore timely under N.Y. C.P.L.R. § 215(8)(a).

## C.     Maria Farmer

35.     Maria Farmer was born on November 28, 1969.  Her parents divorced when she was young, and her mother struggled to financially support Maria and her siblings.  In 1993, Maria moved to New York City to pursue art.

36.     In approximately 1995, Maria was an accomplished artist and graduate student at the New York Academy of Art.  She met Epstein and Ghislaine Maxwell, a British socialite known for recruiting young girls for Epstein, at one of her art openings in New York.  Epstein noticed Maria's artwork and offered to help her art career if she sold a piece of artwork to him for half price.  Maria agreed and sold the painting to Epstein.

37.     Epstein asked Maria many personal questions, including if she had a father, and other questions about her life and family.  Maria told Epstein that her parents were divorced, and that she and her family were struggling financially.

38.     Epstein later offered Maria a job to purchase art for him in New York, and she accepted.

39.     Eventually, Epstein modified Maria's job duties to focus on monitoring and keeping records of who entered Epstein's New York mansion.  In her position at the front door, she observed that Maxwell was regularly bringing school-aged girls to the mansion and that the girls

were always escorted upstairs.  Among the guests that came to the mansion, Maria observed

Alan Dershowitz, a lawyer, on a number of occasions, and observed that he would go upstairs at

the same time the young girls were there.

40.     Maxwell described her role to Maria as recruiting models for Epstein, and told Maria that

the girls were interviewing for modeling positions with Victoria's Secret, a lingerie retailer.

Maria witnessed Maxwell approaching young females on the street and talking to them outside

of the mansion.  Maxwell would leave the mansion claiming she had "to go get girls for Jeffrey"

and referred to the girls she was recruiting as "nubiles."

41.     At the time, Maria was unaware of the sex trafficking conspiracy and believed the girls

and young women were being recruited for modeling positions.

42.     Epstein also made very clear to Maria that he was incredibly wealthy, powerful, and

regularly in contact with world leaders.  In fact, in his New York mansion, he had photographs

displayed of significant political figures to ensure that any young female entering the home

would know that he had extensive government connections.  Epstein was not to be disobeyed and

he made clear by his words and actions that there would be consequences if Maria did not

comply with his demands.

43.     Epstein and Maxwell asked Maria many questions about her family.  Maria often would

use her family members as her subjects for her artwork so she had several photographs of her

siblings, including her younger sister Annie.  Epstein and Maxwell started asking a number of

questions about Annie, and Maria told them how smart Annie was and how she hoped to go to a

great college.  After seeing photos of Annie, Epstein told Maria that he wanted to fly Annie to

New York for a visit.  Maria thought Epstein was simply being generous since Maria had

explained how much she missed seeing Annie.  What Maria did not realize was Epstein was

intending to groom Annie for sexual abuse.

44.     Epstein paid for plane tickets to fly Annie to New York.  During the visit, Epstein took

Annie and Maria to a movie.  During the movie, without Maria's knowledge, Epstein groped

Annie against her will.  Thereafter, Annie left New York to head home without telling Maria that

Epstein groped her during the movie.

45.     After Annie's visit to New York, Epstein began to call Annie and Maria's mother to

discuss Annie and to falsely claim that he was interested in helping Annie with her goal of going

to a great college.  He eventually convinced Annie's mother to allow Annie to fly to his ranch in

New Mexico at the age of 16, where Maxwell and Epstein assaulted her.

46.     During the course of her employment with Epstein, he directed Maria to become an

"artist in residence" at billionaire Les Wexner's Ohio estate.  At the time, Wexner was the chief

executive of the parent company of Victoria's Secret.  Epstein informed Maria that she would be

staying in Epstein's 30,000 square foot guest house that was located on Wexner's Ohio estate.

47.     During Maria's time at Wexner's estate, Epstein and Maxwell visited.  Epstein requested

a foot massage from Maria.  Maria found the request to be disturbing but complied because

Epstein was her employer.

48.     After complying with his request for a massage, Epstein invited Maria to sit on the bed

where he was watching television.  Maxwell then joined them on the bed.  Epstein and Maxwell

proceeded to attack Maria physically against her will, including by violently sexually assaulting

Maria.

49.     Maria fled from the room and called the police.  But the police did not respond to her.

Desperate for help, Maria then called her father for help.  Despite demanding to be allowed to

leave the property, Wexner's security personnel held Maria against her will and did not let her leave the property for several hours, even after she pleaded with them and told them about her assault.  They eventually let Maria leave with her father, who had driven from Kentucky to Ohio to get Maria away from Epstein and Maxwell.

50.     After Maria returned to New York from Ohio, Maxwell called on behalf of Epstein and threatened Maria in order to keep her quiet: "We're going to burn all your art.  And I just want you to know that anything you ever make will be burned.  Your career is burned."

51.     Instead of letting Maxwell's words silence her, Maria reported her assault to the Sixth Precinct of the New York City Police Department ("NYPD").  The NYPD referred Maria to the Federal Bureau of Investigation ("FBI").  Maria followed the instruction and called the FBI to make a report of the abuse.  To the extreme detriment of Maria—and also countless other victims who came after her—authorities ignored Maria's reporting efforts and took no action.

52.     Maria also called her younger sister, Annie, who was overseas studying at an educational seminar for high performing high school students.  During the call, Annie shared with Maria that she too had been assaulted by Epstein and Maxwell in New York and New Mexico.

53.     Frustrated that authorities did not appear to be taking any action and in the hopes of exposing the crimes that Epstein and Maxwell were committing, Maria and Annie decided to share their stories with Vanity Fair magazine. Tragically for Maria and Annie, Epstein threatened and intimidated the magazine and Vanity Fair bent to those threats, ultimately publishing a profile of Epstein without mentioning the sisters or their allegations.

54.     Once Epstein and Maxwell learned that Maria had revealed their sexual abuse to Vanity Fair, they embarked on a campaign to destroy Maria's reputation and art career.  They called

Maria's clients and other individuals in the art community in New York and were ultimately successful in shutting her out of all art-related opportunities.

55.    Maxwell again called Maria to threaten her, but this time threatened her life: "I know you go to the West Side Highway all the time. While you're out there, just be really careful because there are a lot of ways to die there." Afraid for her safety, having informed the NYPD, FBI, and media to no avail, Maria moved several times to try to hide from Epstein and Maxwell. Her fear of Epstein's power was exacerbated by the fact that state and federal authorities, as well as the media, were not taking action against Epstein.

56.     Maria was deeply impacted by her harrowing time with Epstein. She underwent breast reduction surgery because she was unable to forget Epstein and Maxwell's sexual assault.

57.    Maria suffers extreme emotional distress from an experience that has affected her for her entire life.

58.    Epstein's sexual assault and battery of Maria continues to cause her significant distress and harm.

### **FIRST CAUSE OF ACTION**

#### **(Battery)**

59.    Plaintiff repeats and re-alleges the allegations stated above in paragraphs 1–58 as if fully set forth herein.

60.    Epstein intentionally committed battery by sexually assaulting Plaintiff when she was a young woman. As described above, Epstein intentionally touched intimate parts of Plaintiff's body in an offensive and sexual manner without her consent.

13

61.    A criminal action against Epstein with respect to the same sex trafficking enterprise from which Plaintiff's first cause of action arises was terminated on August 29, 2019, less than one year prior to the filing of this Complaint.  *See* N.Y. C.P.L.R. § 215(8)(a).

62.    As a direct and proximate result of Epstein's conduct, Plaintiff has in the past and will in the future continue to suffer extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of her privacy.

## SECOND CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress)

63.    Plaintiff repeats and re-alleges the allegations stated above in paragraphs 1–58 as if fully set forth herein.

64.    As a direct result of these allegations as stated, Epstein committed intentional infliction of emotional distress against Plaintiff.

65.    Epstein's actions, described above, constitute extreme and outrageous conduct that shocks the conscience.  Epstein's plan to recruit, entice, and assault Plaintiff goes beyond all possible bounds of decency and is intolerable in a civilized community.

66.    Epstein knew or disregarded the substantial likelihood that these actions would cause Plaintiff severe emotional distress.

67.    A criminal action against Epstein with respect to the same sex trafficking enterprise from which Plaintiff's second cause of action arises was terminated on August 29, 2019, less than one year prior to the filing of this Complaint.  *See* N.Y. C.P.L.R. § 215(8)(a).

68.    As a direct and proximate result of Epstein's conduct, Plaintiff has in the past and will in the future continue to suffer extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of her privacy.

14

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests judgment against Defendants, awarding

compensatory, consequential, exemplary, and punitive damages in an amount to be determined at

trial; costs of suit; attorneys' fees; and such other and further relief as the Court may deem just

and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all causes of action asserted within this

pleading.

Dated:  November 12, 2019.

/s/ Joshua I. Schiller

David Boies
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
(914) 749-8200

Joshua I. Schiller
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
(212) 446-2300

Sigrid McCawley
(Pro Hac Vice Pending)
BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
(954) 356-0011
